******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# KENNETH COCKERHAM *v.* ADAM WESTPHALEN ET AL.
## (AC 46231)

Alvord, Moll and Clark, Js.

*Syllabus*

Pursuant to statute (§ 52-552e (a)), "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

The defendant J appealed from the judgment of the trial court rendered for the plaintiff on three counts of his complaint that asserted claims of fraudulent transfer against J and her husband, the defendant W, pursuant to the Connecticut Uniform Fraudulent Transfer Act (CUFTA) (§ 52-552a et seq.). In September, 2004, on the advice of W, the plaintiff transferred funds from his 401 (k) account into an individual retirement account (IRA) comanaged by A Co., W's employer. W subsequently formed T Co., and he left his employment with A Co. in 2007. In 2008, on the advice of W, the plaintiff transferred the balance of his IRA into another entity, and the funds were subsequently transferred to a bank account owned by T Co. so that W, as the sole member of T Co., could fully manage and invest the funds for the plaintiff. As part of this transaction, T Co. issued an unsecured promissory note to the plaintiff in the amount of $185,000. The plaintiff invested additional funds into accounts held and managed by T Co. in 2009 and 2011, bringing the plaintiff's total principal investment to more than $227,000. Thereafter, W mismanaged the plaintiff's investments and was negligent in the handling of assets committed to him by the plaintiff by, inter alia, commingling the plaintiff's assets with those of other investors, taking no steps to secure the plaintiff's investment, paying numerous personal expenses with T Co.'s assets and transferring T Co.'s assets to his personal accounts without the knowledge of investors. Between 2008 and 2012, T Co. suffered significant losses, failed to provide the plaintiff with periodic reports concerning T Co.'s poor financial condition and failed to provide the plaintiff with any financial records reflecting the plaintiff's losses. On May 1, 2017, the promissory note from T Co. to the plaintiff

matured. Although W represented to the plaintiff that his assets were secure, T Co. was unable to satisfy its obligation to the plaintiff because it lacked assets sufficient to satisfy the note. W subsequently dissolved T Co., giving no notice of the dissolution to the plaintiff or to any other creditors. The plaintiff commenced the present action in May, 2018, claiming, inter alia, that W and J fraudulently transferred to themselves various moneys and assets belonging to T Co. in violation of CUFTA, specifically § 52-552e. In July, 2018, the plaintiff applied for a prejudgment remedy against, inter alia, J and W, which was granted in January, 2019, as against W. While the litigation was ongoing, the Department of Banking commenced an investigation into W, and, although it was unclear from the record precisely when the department's investigation commenced, as of September, 2018, W had been made aware of the investigation and had retained counsel. Due to this investigation, W closed all his personal bank accounts. Between September, 2018, and July, 2019, W conveyed more than $233,000, representing amounts he had received for professional services he had rendered to various parties, to J through a series of deposits into an account owned solely by her. In July, 2020, the department issued orders that, inter alia, imposed a fine of $900,000 against W and required him to pay restitution to the plaintiff in the amount of $367,000. At trial, J testified that she did not notice in November or December of 2018 that $100,000 had been deposited into her sole personal bank account over a period of two weeks and that she never looked at her bank statements. After the trial, the court, inter alia, rendered judgment against J on three counts of fraudulent transfer, concluding that W fraudulently transferred funds to J between 2018 and 2019 in violation of CUFTA and under the common law. The court found that, at the time of the transfers to J, W was unable to pay fines and restitution orders imposed by the department and had wound up T Co., leaving the plaintiff and others without any means of recovering their investments of principal; that J never provided any consideration for the infusion of funds into her account and used funds from that account to pay various personal and household expenses; that the transfer of funds by W into J's personal account was fraudulent and designed to place his personal assets beyond the reach of creditors, including the plaintiff; and that any claim that J was unaware of the purpose of the fraudulent transfer of funds lacked credibility, that J possessed fraudulent intent and that she willingly and actively participated in W's attempt to shield assets and place those assets beyond the reach of creditors, including the plaintiff. The court also attached J's assets in the amount of the funds fraudulently transferred to her by W. *Held*:

1. J could not prevail on her claim that the trial court erred in concluding that the transfers from W were made with an actual intent to defraud because its finding that both J and W participated in the transfer with

the actual intent to hinder or defraud the plaintiff from collecting on a judgment was clearly erroneous:

a. The trial court properly rendered judgment for the plaintiff on his statutory fraudulent transfer claim pursuant to § 52-552e (a) (1) because its finding that the transfers were made with an actual intent to defraud was not clearly erroneous: because § 52-552e (a) (1) does not require a plaintiff to prove that a transferee shared in a transferor's fraudulent intent, the plaintiff was not required to prove that J shared in W's intent in order to prevail under § 52-552e (a) (1); moreover, the evidence presented at trial revealed that the transfers at issue satisfied many of the factors set forth in § 52-552e (b) that courts may consider in determining whether a transfer was made with actual intent to defraud, including that the transfers were made to an insider, that, before the transfers were made, W had been sued or threatened with suit by way of the present action and the investigation by the department, that W was insolvent or became insolvent shortly after the transfers were made or the obligation was incurred, given that W was unable to pay the fine and restitution imposed by the department, and that, at the time of the transfers, he was unable to pay the amount that the plaintiff had invested in T Co., that W retained possession or control of the property transferred after the transfers were made given that J used the transferred funds to pay various personal and household expenses as well as W's personal expenses, that W did not receive reasonably equivalent value in exchange for the transfers to J given that the evidence adduced at trial showed that W received no value whatsoever in exchange for the transfers because he did not receive anything that he could use to satisfy or partially satisfy a creditor's claim, and that the transfers occurred shortly before and shortly after the court granted the prejudgment attachment against W's assets and before the department imposed the fine against W and ordered restitution to be paid to the plaintiff.

b. The trial court did not err in concluding that the transfers were actually fraudulent under the common law: the court found that any claim that J was unaware of the purpose of the fraudulent transfer of the funds lacked credibility, that she possessed fraudulent intent and that she willingly and actively participated in W's attempt to shield assets and place those assets beyond the reach of creditors, including the plaintiff, and, as the fact finder, the court was entitled to make this credibility determination as to J, and this court would not disturb those findings on appeal; moreover, the trial court, as the finder of fact, was entitled to infer from all of the circumstances surrounding the transfers that J shared in W's fraudulent intent.

2. J could not prevail on her claim that the trial court improperly determined that the transfers to her were constructively fraudulent under the common law and § 52-552e (a) (2): the court's finding that the transfers to J left W unable to meet his financial obligations was not clearly erroneous, as the record revealed that W admitted at trial that he was unable

to pay the fine or restitution imposed on him by the department or the amount that the plaintiff originally invested in T Co. and, further, that he disclosed information regarding J's personal checking account to the department because of the pending investigation against him but that by the time he had done so there was only a small amount of funds remaining in the account; moreover, there was no support in the record for J's argument that she personally invested $750,000 into the T Co. fund, suggesting that the transfers at issue could have been made as a repayment of her investment into T Co., as W testified at trial that the transfers to J's bank account consisted solely of funds that he received for professional services unrelated to T Co. and that he transferred the funds because of the pending department investigation and, thus, based on W's own testimony, it was clear that the transfers at issue were wholly unrelated to J's alleged investment in T Co.; furthermore, although J argued that love and affection is valid consideration between a husband and wife, none of the cases cited by J in her appellate brief stands for the proposition that love and affection may constitute valid consideration for purposes of defeating a fraudulent transfer claim under the common law or CUFTA, and, on the contrary, various courts have long held that love and affection does not constitute adequate consideration for purposes of defeating a fraudulent conveyance claim, and, accordingly, in the absence of any evidence in the record to support J's assertion that W received adequate consideration or reasonably equivalent value for the transfers, this court could not conclude that the trial court's finding that the transfers were made without consideration and not in exchange for a reasonable equivalent value was clearly erroneous.

Argued January 31—officially released May 21, 2024

*Procedural History*

Action to recover damages for, inter alia, fraudulent transfer, and for other relief, brought to the Superior Court in the judicial district of Fairfield and tried to the court, *Hon. Dale W. Radcliffe*, judge trial referee; judgment for the plaintiff, from which the defendant Jennifer Westphalen appealed to this court. *Affirmed.*

*William W. Taylor*, for the appellant (defendant Jennifer Westphalen).

*Sabato P. Fiano*, for the appellee (plaintiff).

*Opinion*

CLARK, J. The defendant Jennifer Westphalen[1] appeals from the judgment of the trial court rendered against her and in favor of the plaintiff, Kenneth Cockerham, on counts nine, ten, and eleven of the plaintiff's complaint, asserting claims of fraudulent transfer against the defendant and her husband, Adam Westphalen (Westphalen), pursuant to the Connecticut Uniform Fraudulent Transfer Act (CUFTA), General Statutes § 52-552a et seq. On appeal, the defendant claims that the court erred in finding that Westphalen fraudulently transferred money to the defendant under the common law[2] and pursuant to General Statutes § 52-552e. Specifically, the defendant argues that the court erred in finding that Westphalen possessed actual fraudulent intent,

---

[1] The plaintiff, Kenneth Cockerham, brought the underlying action against Adam Westphalen; his wife, Jennifer Westphalen; and five entities: AssetMark, Inc., also known as AssetMark Investment Services; Vista Investment Advisors, LLC; Nereid II Fund, LLC; Mosaic Financial Strategies, LLC; and Triton Investment Partners, LLC. Prior to trial, the claims pleaded against all defendants except Adam Westphalen, Jennifer Westphalen, and Triton Investment Partners, LLC, were withdrawn. The only defendant participating in the present appeal is Jennifer Westphalen. Accordingly, all references to the defendant in this opinion are to Jennifer Westphalen only.

[2] Although the operative complaint only asserted statutory fraudulent transfer claims, the court concluded that the plaintiff proved both actual and constructive fraud under the common law and General Statutes § 52-552e. On appeal, neither party has challenged the court's judgment that the defendant is liable for fraudulent transfers at common law on the basis that the plaintiff did not plead a common-law claim. Instead, both parties briefed the merits of the court's judgment that the defendant was liable for fraudulent transfers under the common law. Because neither party has raised any claim of error with respect to the court's judgment on the basis that the plaintiff did not plead a common-law fraudulent transfer claim, we will not disturb the court's judgment on that basis. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 164, 84 A.3d 840 (2014) ("our system is an adversarial one in which the burden ordinarily is on the parties to frame the issues, and the presumption is that issues not raised by the parties are deemed waived"); see also *Guzman* v. *Yeroz*, 167 Conn. App. 420, 426 n.5, 143 A.3d 661 ("a court is not obligated to raise or consider plain error *if a party has failed to do so*" (emphasis in original)), cert. denied, 323 Conn. 923, 150 A.3d 1152 (2016).

that the defendant shared in that intent, and that the transfers were made without consideration, leaving Westphalen unable to meet his financial obligations. We disagree with the arguments advanced by the defendant and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to our resolution of this appeal. The plaintiff's wife, Stacey Cockerham, is the defendant's cousin. The plaintiff first met Westphalen in 1995, and in the years that followed, the couples developed a friendship. Westphalen holds a master's degree in business administration from Cornell University and a degree in legal taxation from the New York University School of Law. He has been a certified financial planner since 2003.

Between 1998 and 2007, Westphalen was employed by AssetMark Investment Services (AssetMark). During this time, he also held a 50 percent interest in Vista Investment Advisors, LLC (Vista). In September, 2004, on the advice of Westphalen, the plaintiff, who at the time was employed by AT&T and participated in his employer's 401 (k) plan, transferred $173,000 from his 401 (k) account into an individual retirement account (IRA) managed by AssetMark and Vista. AssetMark and Vista played a dual role in managing the IRA. Vista's role was to communicate with the plaintiff about his goals and objectives and then to provide AssetMark with that information. AssetMark's role was to take the information given to it by Vista and to manage the account through its investment platform.

While Westphalen was employed by AssetMark, he formed Triton Investment Partners, LLC (Triton). Westphalen was the sole member of Triton and had complete control, management, and authority over all matters relating to Triton. Westphalen was subject to no outside control or direction regarding Triton. Westphalen

claimed that he formed Triton to serve as a vehicle through which he could manage the assets of family members and close friends.

Westphalen left AssetMark in 2007. In 2008, on the advice of Westphalen, the plaintiff transferred the balance of his IRA, in the amount of $187,048.86, into an entity called Pensco Trust. After the funds were transferred to Pensco Trust, they were subsequently transferred to a Chase account owned by Triton so that Westphalen, as the sole member of Triton, could fully manage and invest the funds for the plaintiff. As part of this transaction, Triton issued an unsecured promissory note to the plaintiff in the amount of $185,000. Westphalen did not personally guarantee that promissory note. In 2009, the plaintiff invested an additional $27,266.91 into accounts held and managed by Triton, followed by an additional investment in 2011 in the amount of $12,923.32, bringing the plaintiff's total principal investment to $227,239.09.

Westphalen, as the sole member of Triton, mismanaged the plaintiff's investments and "was negligent in the handling of assets committed to him by [the plaintiff]." For example, once the plaintiff's assets were controlled by Triton, Westphalen began to commingle the plaintiff's assets with those of other investors. Westphalen took no steps to secure the plaintiff's investment. Throughout the years, Westphalen paid numerous personal expenses with Triton assets and transferred Triton assets to his personal accounts without the knowledge of investors. Between 2008 and 2012, Triton suffered losses between $1.5 and $2 million. During this period, Triton did not provide the plaintiff with periodic reports concerning Triton's poor financial condition and failed to provide the plaintiff with any financial records reflecting the plaintiff's losses.

On May 1, 2017, the operative promissory note from Triton to the plaintiff matured. Although Westphalen

represented to the plaintiff that his assets were secure, Triton was unable to satisfy its obligation to the plaintiff because it lacked assets sufficient to satisfy the note. Westphalen subsequently dissolved Triton, giving no notice of the dissolution to the plaintiff or to any other creditors.

The plaintiff commenced this action on May 17, 2018, claiming, inter alia, that Westphalen, acting both as an individual and as the sole member of Triton, had mismanaged, dissipated, and ultimately lost the retirement funds the plaintiff had entrusted to Westphalen and various limited liability and corporate entities. Relevant for present purposes, in counts nine, ten, and eleven of the complaint, the plaintiff claimed that Westphalen and the defendant fraudulently transferred to themselves various moneys and assets belonging to "Westphalen Entities"[3] in violation of § 52-552e.[4] Specifically, count nine alleged a violation of § 52-552e (a)

---

[3] The complaint alleged that the "Westphalen Entities" included Vista, Triton, and two other entities, Mosaic Financial Strategies, LLC, and Nereid II Fund, LLC, and that Westphalen was a principal and/or interest holder in each of them.

[4] General Statutes § 52-552e provides: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

"(b) In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent

(1), count ten alleged a violation of § 52-552e (a) (2) (A), and count eleven alleged a violation of § 52-552e (a) (2) (B).

On July 26, 2018, the plaintiff applied for a prejudgment remedy against the defendant, Westphalen, Triton, and Mosaic Financial Strategies, LLC (Mosaic), pursuant to General Statutes § 52-278a et seq., in the amount of $500,000. A hearing on the application was held before the court, *T. Welch*, *J.*, on November 8, 2018. On January 7, 2019, the court granted the plaintiff's application for a prejudgment remedy against Westphalen and Triton. The court stated: "After a careful review of the evidence, briefs, the corresponding legal principles and taking into consideration the defendants' proposed defenses . . . the court finds that probable cause exists to support the plaintiff's claims against [Westphalen] and [Triton] as to count three (negligent misrepresentation) and count four (negligence) and against [Triton] as to count eight (breach of contract). The court does not find that the plaintiff has satisfied his burden of proof relative to [the defendant] or [Mosaic] as to any of the counts which were the subject of the prejudgment remedy hearing nor has the plaintiff satisfied his burden of proof relative to the first count (promissory estoppel). Accordingly, pursuant to General Statutes § 52-278d, the court grants a prejudgment attachment in favor of the plaintiff and against [Triton] and [Westphalen] only, in the amount of $450,000."

While this litigation was ongoing, the Department of Banking (department) commenced an investigation into

to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

Westphalen. Although it is unclear from the record precisely when the department's investigation commenced, as of September, 2018, Westphalen had been made aware of the investigation and had retained counsel. Due to this investigation, Westphalen closed all his personal bank accounts. Beginning in September, 2018, and continuing through July, 2019, Westphalen conveyed $233,069.28 to the defendant through a series of deposits into an account owned solely by the defendant. These transfers represented amounts that he had received for professional services that he had rendered to various parties. On July 27, 2020, the department issued orders that, inter alia, imposed a fine of $900,000 against Westphalen and required him to pay restitution to the plaintiff in the amount of $367,000.

The matter was subsequently tried to the court, *Hon. Dale W. Radcliffe*, judge trial referee, on January 12 and 13, 2022.[5] On June 22, 2022, the court rendered judgment against the defendant on counts nine, ten, and eleven of the complaint,[6] concluding that Westphalen fraudulently transferred funds to the defendant between 2018 and 2019 in violation of CUFTA and under the common law.[7] The court stated: "Westphalen testified that he deposited income into an account solely

[5] This matter was tried twice. The first trial commenced on October 10, 2019, and concluded on January 8, 2020, before the court, *Hon. Edward F. Stodolink*, judge trial referee. On March 16, 2021, the defendant and Westphalen filed a motion for a mistrial predicated on the court's failure to render a timely decision pursuant to General Statutes § 51-183b, which requires that a trial court render a decision within 120 days after the completion of a civil trial. On April 22, 2021, the court, *Stevens*, *J.*, granted the motion for a mistrial, and a new trial was scheduled.

[6] The court also rendered judgment against Westphalen on counts four, five, seven, eight, and fifteen of the complaint and rendered judgment against Triton on count eight of the complaint.

[7] Although the plaintiff's complaint alleged fraudulent transfers from the Westphalen Entities to Westphalen and the defendant that occurred prior to the date the complaint was filed, the evidence presented at trial, and on which the trial court's judgment is based, is predicated on transfers occurring between Westphalen and the defendant in 2018 and 2019, after the complaint was filed. The defendant, however, did not object on that basis to any of

in the name of [the defendant] and closed existing accounts in his own name because of the proceedings before the [department]. At the time of the transfers, 2018 and 2019, [Westphalen] was unable to pay fines and restitution orders imposed by the [department] and had wound up [Triton], leaving the plaintiff and others without any means of recovering their investments of principal.

"[The defendant] never provided any consideration for the infusion of funds into her account and used funds from that account to pay various personal and household expenses. She also deposited her own income into the account.

"It is found that the transfer of funds by [Westphalen] into [the defendant's] personal account was fraudulent and designed to place his personal assets beyond the reach of creditors and potential creditors, including [the plaintiff].

"It is found that both actual and constructive fraud, both at common law and pursuant to applicable statutes, has been proven by clear and convincing evidence.

"It is found that any claim that [the defendant] was unaware of the purpose of the fraudulent transfer of funds lacks credibility. It is found by clear and convincing evidence that [the defendant] possessed fraudulent

the evidence presented in the trial court and has not challenged the court's judgment on that basis in this appeal. Because these causes of action, while unpleaded, were actually litigated at trial, without objection, we will not disturb the trial court's judgment on the basis of a pleading irregularity. See *Gleason* v. *Durden*, 211 Conn. App. 416, 431, 272 A.3d 1129 ("[I]n the context of a postjudgment appeal, if a review of the record demonstrates that an unpleaded cause of action actually was litigated at trial without objection such that the opposing party cannot claim surprise or prejudice, the judgment will not be disturbed on the basis of a pleading irregularity. . . . In that circumstance, provided the plaintiff has produced sufficient evidence to prove the elements of his unpleaded claim, the defendant will be deemed to have waived any defects in notice." (Internal quotation marks omitted.)), cert. denied, 343 Conn. 921, 275 A.3d 211 (2022).

intent and willingly and actively participated in the attempt of [Westphalen] to shield assets and place those assets beyond the reach of creditors, including [the plaintiff].

"It is found that the amount of money transferred by [Westphalen] is $233,069.28.

"Judgment may therefore enter, as to counts nine, ten and eleven, as against both [Westphalen] and [the defendant]. It is further found that an attachment against the assets of [the defendant] should enter based upon the fraudulent transfers of money into her account, in the amount of $233,069.28." This appeal followed.

On appeal, the defendant claims that the court erred "in finding actual and constructive fraud at both common law and pursuant to [§ 52-552e]" because the evidence does not support the court's findings that Westphalen possessed actual fraudulent intent, that the defendant willingly and actively participated in the alleged fraud, or that the transfers were made without consideration, leaving Westphalen unable to meet his financial obligations. We are not persuaded.

We begin by setting forth the standard of review and legal principles relevant to this claim. "The determination of whether a fraudulent transfer took place is a question of fact and it is axiomatic that [t]he trial court's [factual] findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . The elements of fraudulent conveyance, including

whether the defendants acted with fraudulent intent, must be proven by clear, precise and unequivocal evidence. . . . This standard, also referred to as the clear and convincing standard, is met if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. . . . Put another way, the clear and convincing standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Citation omitted; internal quotation marks omitted.) *Featherston* v. *Katchko & Son Construction Services, Inc.*, 201 Conn. App. 774, 792, 244 A.3d 621 (2020), cert. denied, 336 Conn. 923, 246 A.3d 492 (2021).

In Connecticut, there exists both a common-law and statutory cause of action for fraudulent conveyance. "A party alleging a fraudulent transfer or conveyance under the common law bears the burden of proving either: (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations [(constructive fraud)] or (2) that the conveyance was made with a fraudulent intent in which the grantee participated [(actual fraud)]." (Internal quotation marks omitted.) *McKay* v. *Longman*, 332 Conn. 394, 417, 211 A.3d 20 (2019).

Under § 52-552e, on the other hand, "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which

the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." With these principles in mind, we turn to the defendant's claims on appeal.

I

We first address the defendant's claim that the court erred in concluding that the transfers were made with an actual intent to defraud pursuant to § 52-552e (a) (1) and under the common law because its finding that both the defendant and Westphalen participated in the transfer with the actual intent to hinder or defraud the plaintiff from collecting on a judgment was clearly erroneous. We are not persuaded.

A

With respect to the court's conclusion that the plaintiff was entitled to a judgment on his statutory fraudulent transfer claim, the defendant first argues that the court's finding that the transfers were made with an actual intent to defraud was clearly erroneous because "[t]here is absolutely no clear and convincing evidence of fraudulent intent on the part of [the defendant], and therefore actual fraud cannot be found." The plaintiff correctly points out, however, that § 52-552e (a) (1) does not require a plaintiff to prove that a transferee like the defendant shared in a transferor's fraudulent intent.

Section 52-552e (a) (1) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor . . . ." Unlike the common law, the statutory cause of action for a fraudulent transfer

based on a transferor's actual intent to defraud a creditor does not require a plaintiff to prove that a transferee shared the transferor's fraudulent intent. In *Kosiorek* v. *Smigelski*, 138 Conn. App. 695, 54 A.3d 564 (2012), cert. denied, 308 Conn. 901, 60 A.3d 287 (2013), this court explained that, "[p]rior to the adoption of [§ 52-552e], the plaintiff had to prove (1) that the transferor had intent to defraud the creditor and (2) that the transferee shared in the transferor's fraudulent intent. . . . The plain language in § 52-552e addresses the fraudulent intent of the debtor and makes no mention of the fraudulent intent of the transferee." (Emphasis omitted; internal quotation marks omitted.) Id., 726. Therefore, "[w]ith respect to [claims] under § 52-552e . . . *there is no requirement for a fraudulent intent with respect to the transferees*." (Emphasis added.) Id., 727. Because a plaintiff is not required to prove that a transferee shared in a transferor's intent in order to prevail under § 52-552e (a) (1), the defendant's claim, that the court erred in holding her liable because its finding that she shared in Westphalen's fraudulent intent was clearly erroneous, fails as a matter of law.

Nevertheless, the defendant also claims that the court erred in holding her liable under § 52-552e (a) (1) because its finding that Westphalen made the transfers with the actual intent to hinder, delay, or defraud the plaintiff also was clearly erroneous. Specifically, the defendant argues that there was no evidence to support such a finding. We disagree.

"With respect to finding actual intent as set forth in § 52-552e (a) (1), [our Supreme Court has] stated that, because fraudulent intent is almost always . . . proven by circumstantial evidence, courts may consider numerous factors in determining whether a transfer was made with actual intent to defraud." (Internal quotation marks omitted.) *McKay* v. *Longman*, supra, 332 Conn. 422. These factors are set forth in § 52-552e (b), which

provides: "In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

In support of its finding that Westphalen transferred funds to the defendant with actual intent to hinder, delay, or defraud his creditors, the court stated that "Westphalen testified that he deposited income into an account solely in the name of [the defendant], and closed existing accounts in his own name, because of the proceedings before the [department]." The court further found "that the transfer of funds by [Westphalen] into [the defendant's] personal account was fraudulent and designed to place his personal assets beyond the reach of creditors and potential creditors, including [the plaintiff]."

On the basis of our review of the record, we conclude that these findings were not clearly erroneous. At trial, evidence was presented that Westphalen conveyed

$233,069.28 to the defendant through a series of deposits that occurred between September, 2018, and July, 2019. Westphalen testified that these transfers represented amounts that he had received for professional services that he had rendered to various parties, which he subsequently deposited into a bank account owned solely by the defendant.

The evidence presented at trial revealed that the transfers at issue in this case satisfy many of the § 52-552e (b) factors that "courts may consider . . . in determining whether a transfer was made with 'actual intent' to defraud." *McKay* v. *Longman*, supra, 332 Conn. 422. To begin, there is no dispute that the transfers were made "to an insider." General Statutes § 52-552e (b) (1). The transfers were made by Westphalen to his wife, the defendant. Pursuant to General Statutes § 52-552b (7), " '[i]nsider' includes . . . a relative of the debtor" and, pursuant to § 52-552b (11), " '[r]elative' means . . . a spouse . . . ."

Next, the evidence showed that "before the transfer was made . . . the debtor had been sued or threatened with suit . . . ." General Statutes § 52-552e (b) (4). This action was commenced on May 17, 2018, and the transfers did not begin until September, 2018. Although it is unclear from the record exactly when the department commenced its investigation, Westphalen testified that, as of September, 2018, before any of the transfers had occurred, he had been made aware of the investigation and had retained counsel. Indeed, Westphalen specifically testified that he transferred the funds to the defendant and closed all his personal bank accounts on the advice of his attorney due to the pending department investigation.[8] Thus, Westphalen clearly had been sued or threatened with suit before the transfers were made.

---

[8] The following exchange took place during the direct examination of Westphalen by the plaintiff's counsel:

"[The Plaintiff's Counsel]: Okay. And we've already seen from the evidence that, at this time, there were, in fact, other bank accounts that—that you

The evidence also showed that "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred . . . ." General Statutes § 52-552e (b) (9). General Statutes § 52-552c, which defines insolvency, provides in relevant part: "(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. (b) A debtor who is generally not paying his debts as they become due is presumed to be insolvent. . . ." The court found that Westphalen was unable to pay the fine and restitution imposed by the department and that, "[a]t the time of the transfers, 2018 and 2019 . . . [he] had wound up [Triton], leaving the plaintiff and others without any means of recovering their investments of principal." At trial, Westphalen admitted that he was unable to pay the fine imposed on him by the department, the restitution he was ordered to pay the plaintiff by the department, or the amount that the plaintiff originally invested in Triton.[9] It is clear, therefore,

were on either singly or jointly along with your wife at this time?

"[Westphalen]: No. They weren't open anymore.

"[The Plaintiff's Counsel]: [They] were not open. And—and why were— why were your accounts not open anymore?

"[Westphalen]: I just had closed them and then based on the [department] stuff, they said don't open any other—I was advised by an attorney not to open any other accounts.

"[The Plaintiff's Counsel]: But why did you go ahead and close the accounts with your name on them?

"[Westphalen]: I don't recall, at this point. I just—I closed them and was normally using business accounts and those had to be closed because I had a cease and desist so I had to put the money that I earned myself somewhere . . . ."

[9] The following exchange took place during the direct examination of Westphalen by the plaintiff's counsel:

"[The Plaintiff's Counsel]: And with respect to—with respect to your own personal solvency, do you have the financial wherewithal to pay the fines that have been imposed by the [department]?

"[Westphalen]: No.

"[The Plaintiff's Counsel]: As to your own financial wherewithal do you have sufficient solvency to pay the amount of restitution ordered by the [department] to [the plaintiff]?

"[Westphalen]: No.

that Westphalen either was insolvent at the time of the transfers or became insolvent shortly after the transfers occurred.

Next, the evidence clearly supports the conclusion that Westphalen "retained possession or control of the property transferred after the transfer . . . ." General Statutes § 52-552e (b) (2). The court found that the defendant used the transferred funds "to pay various personal and household expenses." Westphalen's personal expenses were paid primarily out of the transferred funds that were deposited into the defendant's account, and he testified that many household bills and other expenses also were paid from the transferred funds. Thus, there was uncontroverted evidence presented at trial to support a finding that Westphalen retained most of the benefits of the subject funds after he transferred them to the defendant. See *Cadle Co.* v. *White*, Docket No. 302-CV-00030 (TPS), 2006 WL 798900, *6 (D. Conn. March 21, 2006) (finding that debtor retained actual and constructive control over funds transferred to wife's bank account where his personal expenses, household bills, and home mortgage payments were paid using such funds).

Additionally, under § 52-552e (b) (8), evidence that a transferor did not receive reasonably equivalent value in exchange for a transfer may support a finding of fraudulent intent. For the reasons that we explain more fully in part II of this opinion, it is clear that Westphalen did not receive anything from the defendant that constitutes reasonably equivalent value in exchange for the transfers. The court found that "[the defendant] never provided any consideration for the infusion of funds

---

"[The Plaintiff's Counsel]: Currently—and I understand we're debating. I'm not saying you're obligated. I'm just asking on a pure math basis. Do you have the solvency to pay back to [the plaintiff] the base amount of what he invested in Triton in the amount of $227,000?

"[Westphalen]: No."

into her account . . . ." Pursuant to § 52-552d (a), "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." The evidence adduced at trial showed that Westphalen received no value whatsoever in exchange for the transfers because he did not receive anything that he could use to satisfy or partially satisfy a creditor's claim. See *Cadle Co.* v. *White*, supra, 2006 WL 798900, *9 ("Courts in this district applying [CUFTA] as well as courts interpreting the [Uniform Fraudulent Transfer Act (UFTA)] in other jurisdictions have held value to mean the type of consideration capable of satisfying or partially satisfying a creditor's claims. . . . 'Value is to be determined in light of the purpose of the [UFTA] to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition.' [Unif. Fraudulent Transfer Act (1984) § 3, comment 2, 7A U.L.A. (Pt. II) 302 (2017)]." (Citations omitted.))

Finally, it is clear that "the transfer occurred shortly before or shortly after a substantial debt was incurred . . . ." General Statutes § 52-552e (b) (10). The transfers happened periodically between September, 2018, and July, 2019. On January 7, 2019, the court granted a prejudgment attachment in the amount of $450,000 against the assets of Westphalen. Additionally, Westphalen testified that, on July 27, 2020, shortly after the transfers occurred, the department imposed a fine in the amount of $900,000 against him and ordered him to pay the plaintiff restitution in the amount of $367,000.[10]

---

[10] The following exchange took place during the direct examination of Westphalen by the plaintiff's counsel:

"[The Plaintiff's Counsel]: Mr. Westphalen, is it a fair statement that on

Thus, the transfers happened both shortly before and shortly after Westphalen had incurred substantial debts in the form of the department's fine and restitution order. He also was subject to the prejudgment attachment order.

In short, the evidence presented at trial supported findings implicating at least six of the eleven statutory factors that courts consider when determining whether a transfer was made with an actual intent to hinder, delay, or defraud creditors. Thus, on the basis of all of this evidence, we conclude that the court's finding that the transfers to the defendant were fraudulent pursuant to § 52-552e (a) (1) because Westphalen made them with an actual intent to defraud his creditors was not clearly erroneous.[11]

---

or about July 27, 2020 . . . the [department] issued an order against you where it imposed a fine of $900,000 to be paid no later than forty-five days after the order was mailed?

"[Westphalen]: I never received proper notice of that.

"[The Plaintiff's Counsel]: Okay. Are you aware though that such an order has been—has been imposed by the [department] that you have been fined an amount of $900,000 that was to be paid no later than forty-five days after the date of the order? . . .

"[Westphalen]: I'm aware of it. Yes.

"[The Plaintiff's Counsel]: Okay. Mr. Westphalen, are you aware that the [department] has ordered you to make restitution to [the plaintiff] in the amount of $367,000 plus interest at 6 percent no later than forty-five days after its order that was rendered on July 27, 2020?

"[Westphalen]: I am since aware. Yes."

[11] In her reply brief, the defendant argues that the court erred in finding that Westphalen possessed actual fraudulent intent, stating: "It should be noted that the transfers of funds from [Westphalen] to [the defendant] . . . were commenced . . . after this action was filed . . . . In other words, [the defendant] was already a defendant in the foregoing action when all alleged fraudulent transfers to shield assets were made. Common sense would tell anyone that if you wanted to dispose of and/or hide your assets, you would not transfer the assets to another named defendant in the litigation against you." We interpret the defendant's argument to be taking issue with the court's weighing of the evidence and the testimony that it chose to credit. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . [T]he trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal,

B

Next, the defendant claims that the court erred in concluding that the transfers were actually fraudulent under the common law because "[t]here is absolutely no clear and convincing evidence of fraudulent intent on the part of [the defendant], and therefore actual fraud cannot be found." The plaintiff counters that the record supports the court's finding that the defendant shared in Westphalen's fraudulent intent with respect to the transfers. We agree with the plaintiff.

As noted earlier in this opinion, although a transferee's intent is irrelevant for purposes of proving actual fraud pursuant to § 52-552e (a) (1); see *Kosiorek* v. *Smigelski*, supra, 138 Conn. App. 727; in order to prevail on a common-law claim for fraudulent transfer on the basis of actual fraud, a plaintiff must prove that the transferee shared in the transferor's fraudulent intent. See *Wieselman* v. *Hoeniger*, 103 Conn. App. 591, 598, 930 A.2d 768 (to prevail on common law fraudulent transfer claim based on actual fraud, "plaintiff ha[s] to prove (1) that the transferor had intent to defraud the creditor and (2) *that the transferee shared in the transferor's fraudulent intent*" (emphasis added; internal quotation marks omitted)), cert. denied, 284 Conn. 930, 934 A.2d 245 (2007).

In concluding that the transfers at issue in this case were actually fraudulent under the common law, the court first found, as discussed in part I A of this opinion, that Westphalen transferred funds to the defendant with

we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *Sakon* v. *Glastonbury*, 111 Conn. App. 242, 252, 958 A.2d 801 (2008), cert. denied, 290 Conn. 916, 965 A.2d 554 (2009). The trial court weighed both parties' evidence and ultimately found that Westphalen did possess actual fraudulent intent regardless of the timing of the transfers. The court was free to discredit or find unpersuasive the defendant's evidence, and we decline the defendant's invitation to reweigh the evidence in her favor on appeal.

the actual intent to hinder, delay, or defraud the plaintiff. Next, the court found that the defendant, as the transferee, shared in Westphalen's fraudulent intent, stating "[i]t is found that any claim that [the defendant] was unaware of the purpose of the fraudulent transfer of the funds lacks credibility. It is found, by clear and convincing evidence, that [the defendant] possessed fraudulent intent and willingly and actively participated in the attempt of [Westphalen] to shield assets and place those assets beyond the reach of creditors, including [the plaintiff]."

At trial, the defendant testified that she did not notice in November or December of 2018 that $100,000 had been deposited into her bank account over a period of two weeks. She further testified that this was her sole personal bank account and that she "never looked at [her bank] statements ever." The court found that "any claim that [the defendant] was unaware of the purpose of the fraudulent transfer of the funds lacks credibility." As the fact finder, the court was entitled to make this credibility determination as to the defendant, and we will not disturb these findings on appeal. See *Featherston* v. *Katchko & Son Construction Services, Inc.*, supra, 201 Conn. App. 792 ("[w]e cannot retry the facts or pass on the credibility of the witnesses" (internal quotation marks omitted)). Moreover, the court, as the finder of fact, was entitled to infer from all of the circumstances surrounding the subject transfers that the defendant shared in Westphalen's fraudulent intent. See *Wieselman* v. *Hoeniger*, supra, 103 Conn. App. 600 ("[T]he determination of the question of fraudulent intent is clearly an issue of fact which must often be inferred from surrounding circumstances. . . . Such a fact is, then, not ordinarily proven by direct evidence, but rather, by inference from other facts proven—the indicia or badges of fraud." (Internal quotation marks omitted.)).

On the basis of our review of the record, we conclude that the court's findings that Westphalen made the transfers to the defendant with the actual intent to hinder, delay, or defraud the plaintiff and that the defendant shared in this fraudulent intent were not clearly erroneous.

II

Although our determination that the court did not err in finding the defendant liable under both the common-law and statutory causes of action because the transfers were made with an actual intent to hinder, delay, or defraud the plaintiff is a sufficient basis on which to affirm the trial court's judgment; see *McKay* v. *Longman*, supra, 332 Conn. 417 (party need not prove both actual and constructive fraud to prevail on fraudulent transfer claim); we conclude that the defendant's challenge to the court's determination that the transfers were constructively fraudulent under the common law and pursuant to § 52-552e (a) (2) also fails.

In order to prove that a transfer was constructively fraudulent under the common law, a party must prove "that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations . . . ." Id. Similarly, under § 52-552e (a) (2), "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation . . . (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability

to pay as they became due." Pursuant to § 52-552d (a), "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."

On appeal, the defendant first argues that "there was insufficient proof that [Westphalen] could not pay his fines and restitution as required by the [department]." Specifically, the defendant contends that "[t]he plaintiff has not proven by clear and convincing evidence that [Westphalen] had left himself insolvent, as to an alleged debt owed to the plaintiff, at the time of the conveyance(s), and therefore the claim of fraudulent conveyance must fail." In support of that contention, the defendant maintains that "[t]here was no evidence at the time of trial to show what [Westphalen's] elaborate home in Easton, Connecticut, was appraised or valued for during the various dates of alleged fraudulent conveyance(s) of funds" and that Westphalen testified to various income streams that were not identified by the court as sources of income. We are not persuaded.

In support of its finding that the transfers rendered Westphalen unable to meet his financial obligations, the court found that Westphalen was unable to pay the fines and restitution orders imposed by the department and that, "[a]t the time of the transfers, 2018 and 2019 . . . [he] had wound up [Triton], leaving the plaintiff and others without any means of recovering their investments of principal." Our review of the record reveals that Westphalen admitted at trial that he was unable to pay the fine or restitution imposed on him by the department or the amount that the plaintiff originally

invested in Triton.[12] He further testified that he disclosed information regarding the defendant's personal checking account, where he had been transferring his income, to the department because of the pending investigation against him, but by the time he had done so there was only $2696 remaining in the account.[13] As a result, the court's finding that the transfers left Westphalen unable to meet his financial obligations was not clearly erroneous.

The defendant next claims that there "clearly was evidence that monetary consideration was passed between [Westphalen] and [the defendant] in response to [Westphalen's] deposits in [the defendant's] account." In support of this claim, the defendant argues that the court "failed to make a finding of fact as to what [the defendant's] income was" and states that she invested "$750,000, by way of her personal inheritance, into the Triton fund," suggesting that the transfers at issue could have been made as a repayment of her investment into Triton. The defendant's arguments are wholly without merit.

In support of its determination that the transfers were made without adequate consideration, the court found that "[the defendant] never provided any consideration for the infusion of funds into her account and used funds from that account to pay various personal and

---

[12] See footnote 9 of this opinion.

[13] Westphalen testified as follows during cross-examination by the plaintiff's counsel:

"[The Plaintiff's Counsel]: Isn't it a fair statement, sir, that in the—in the approximate year before the submission of this financial affidavit [to the department], approximately $260,000 of your income had gone into this account . . . ?

"[Westphalen]: Well, yeah, we've agreed to that. Yes.

"[The Plaintiff's Counsel]: Okay. And so, but as of the date that you actually disclosed the account to the [department], the balance in there was only $2696, correct?

"[Westphalen]: Well, yeah, it's right there. Yes, correct."

household expenses. She also deposited her own income into the account." The defendant's argument on appeal that her alleged investment in Triton constituted adequate consideration for the transfers at issue finds no support in the record. Westphalen testified that the transfers to the defendant's bank account consisted solely of funds that he received for professional services unrelated to Triton and that he transferred the funds because of the pending department investigation. Thus, based on Westphalen's own testimony, it is clear that the transfers at issue were wholly unrelated to the defendant's alleged investment in Triton.

Last, the defendant argues that "it has long been held in Connecticut that between a husband and wife 'love and affection' is valid consideration," citing to *Middlebury* v. *Steinmann*, 189 Conn. 710, 716 n.3, 458 A.2d 393 (1983); *Varley* v. *Varley*, 170 Conn. 455, 460, 365 A.2d 1212 (1976); and *Candee* v. *Connecticut Savings Bank*, 81 Conn. 372, 378, 71 A. 551 (1908). At the outset, we note that none of the cases cited by the defendant stands for the proposition that love and affection may constitute valid consideration for purposes of defeating a fraudulent transfer claim under the common law. See *Middlebury* v. *Steinmann*, supra, 716 n.3 (finding inadequate consideration for transfer of property because "[l]ove and affection . . . does not provide legal consideration which would support enforcement of a promise"); *Varley* v. *Varley*, supra, 460 ("[c]onsideration of love and affection is not legal consideration which would support enforcement of a promise" (internal quotation marks omitted)); *Candee* v. *Connecticut Savings Bank*, supra, 378 ("[a] good consideration is that of blood or natural affection, and a gift made for such a consideration ought to prevail unless it be found to interfere with the rights of creditors and purchasers"). On the contrary, our Supreme Court has long held that

love and affection does not constitute adequate consideration for purposes of defeating a fraudulent conveyance claim under the common law. See *Redfield* v. *Buck*, 35 Conn. 328, 337–38 (1868). In *Redfield*, the court held that an insolvent grantor's conveyance to his sister of all of his property, in consideration only of love and affection, was a constructively fraudulent transfer. Id. The court stated that a transfer was constructively fraudulent if it was "made by a grantor who was largely indebted and insolvent, and the property conveyed was all or nearly all he possessed, and the conveyances were wholly gratuitous and without other consideration than love and affection . . . ." Id.

The defendant's argument with respect to the statutory fraudulent transfer claim under § 52-552e (a) (2) fares no better. To prevail on a fraudulent transfer claim on the basis of constructive fraud under § 52-552e (a) (2), a plaintiff must prove that a transfer was made "without receiving a reasonably equivalent value in exchange for the transfer or obligation . . . ." General Statutes § 52-552e (a) (2).

"[T]he drafters of the UFTA believed that value must be considered from the standpoint of the creditor"; *Cadle Co.* v. *White*, supra, 2006 WL 798900, *9; and the commentary to the UFTA specifically states that " '[v]alue' is to be determined in light of the purpose of the [UFTA] to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition. The definition does not specify all the kinds of consideration that do not constitute value for the purposes of this Act—e.g., love and affection." Unif. Fraudulent Transfer Act (1984) § 3, comment 2, supra, 7A U.L.A. (Pt. II) 302; see, e.g., *United States* v. *West*, 299 F. Supp. 661, 666 (D. Del. 1969) ("[s]ince 'the question of fair consideration as it pertains to an alleged fraudulent

conveyance must be determined from the standpoint of creditors' . . . it is clear that no fair equivalent is exchanged when the conveyance is simply for natural love and affection" (citation omitted)).

Consistent with that commentary, federal courts in Connecticut and elsewhere have held that, in order for an exchange to be of reasonably equivalent value under CUFTA and other states' versions of the UFTA, it must be something with monetary value capable of satisfying a creditor's claims. See *In re Rose*, Docket No. 17-21333 (JJT), 2019 WL 1410633, \*4 (Bankr. D. Conn. March 26, 2019) ("Only consideration of substantially equivalent value leaves the debtor in a financially similar position after the conveyance. A conveyance made for consideration of nominal or no monetary value leaves the debtor in a much weakened financial position which hinders his creditors. This is precisely the scenario the [UFTA] attempts to prevent. Recognizing consideration of no monetary value as a defense to a fraudulent conveyance would emasculate the statute." (Internal quotation marks omitted.)); *Cadle Co.* v. *White*, supra, 2006 WL 798900, \*9 ("[c]ourts in this district applying [CUFTA] as well as courts interpreting the UFTA in other jurisdictions have held value to mean the type of consideration capable of satisfying or partially satisfying a creditor's claims"); *Cadle Co.* v. *Jones*, Docket No. 3:00CV316 (WWE), 2004 WL 2049321, \*6 (D. Conn. August 20, 2004) ("in considering whether fraudulent intent exists, the relevant inquiry is not simply whether the debtor received some type of consideration, but whether that consideration was in the form available for execution by creditors"); *In re Ogalin*, 303 B.R. 552, 559 (Bankr. D. Conn. 2004) ("the relevant inquiry is not simply whether [the debtor] received consideration, but whether that consideration was in a form available for execution by creditors, i.e. an assessment of the extent to which such creditors were deprived of the value of the diverted

property"); *In re Kennedy*, 279 B.R. 455, 463 (Bankr. D. Conn. 2002) ("The only other form of value suggested by the [d]efendant was her provision of household and other marital services to the [d]ebtor. The [c]ourt rejects this suggestion . . . [and concludes that] such services were in the nature of those naturally and traditionally exchanged between spouses without consideration, and hence provided no basis of exchange value for purposes of fraudulent transfer analysis."); see also *In re McFarland*, 619 Fed. Appx. 962, 975 (11th Cir. 2015) ("[t]his [c]ourt has held that 'love and affection' are inadequate consideration to be reasonably equivalent value for a transfer"); *In re Marlar*, 267 F.3d 749, 755–56 (8th Cir. 2001) (affirming bankruptcy court conclusion that ten dollars plus love and affection did not constitute reasonably equivalent value as matter of law); *Tavenner* v. *Smoot*, 257 F.3d 401, 408 (4th Cir. 2001) (when interpreting similar statute, 11 U.S.C. § 548, "courts have consistently held that a transfer motivated by love and affection does not constitute reasonably equivalent value"), cert. denied, 534 U.S. 1116, 122 S. Ct. 926, 151 L. Ed. 2d 890 (2002).

In the absence of any evidence in the record to support the defendant's assertion that Westphalen received adequate consideration or reasonably equivalent value for the transfers, we cannot conclude that the court's finding that the transfers were made without consideration and not in exchange for a reasonable equivalent value was clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.